IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CHARLES HOW, | ) | **CONSOLIDATED CASES** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-2256-JWL |
| | ) | |
| CITY OF BAXTER SPRINGS, KANSAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| RONALD O. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-2257-JWL |
| | ) | |
| CITY OF BAXTER SPRINGS, KANSAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

On May 2, 2005, the court convened a telephone status conference in these consolidated cases.  Charles How, the plaintiff in the lead case, No. 04-2256, appeared through his counsel, Sam L. Colville.  Ronald O. Thomas, the plaintiff in the consolidated case, No. 04-2257, appeared through his counsel, William J. Skepnek.  The City of Baxter Springs, Kansas and Robert E. Myers, named as defendants in both cases, appeared through

their counsel, David R. Cooper.  Donna Wixon,  also a defendant in both cases, appeared through her counsel, Edward L. Keeley.

During the conference, the court heard oral arguments with regard to defendants' motions to compel in Case No. 04-2256 (**docs. 53 & 56**), and Mr. How's corresponding motion for a protective order in that case (**doc. 54**).  All of these motions involve the issue of whether Mr. How, when his deposition is reconvened, should be required to disclose certain of his "confidential" sources of information.  Mr. How seeks to shield from discovery the sources for various statements made by him in numerous "letters to the editor" of the *Baxter Springs News*, a newspaper in Baxter Springs, Kansas.  These letters were written during the year preceeding the newspaper's publication on March 11, 2003, of a political advertisement paid for by Mr. How.  That advertisement formed the stated basis of a criminal defamation action initiated by defendants against Mr. How.  Significantly, though, it is uncontroverted that <u>both</u> Mr. How's letters to the editor <u>and</u> his political advertisement were critical of Ms. Wixon, the City Clerk of Baxter Springs.

A similar motion for protective order (**doc. 44**) and motion to compel (**doc. 45**) have been filed with regard to Mr. Thomas in Case No. 04-2257, although evidently due to health considerations, Mr. Thomas has not yet been deposed or even been scheduled to be deposed at this time.  That is, Mr. Thomas had various "guest editorials" published in the *Baxter Springs News*, and one these columns, which was published on March 11, 2003 (i.e., the same date as Mr. How's above-described political advertisement), led to a separate criminal

defamation charge against Mr. Thomas.  Here again, though, it appears undisputed that <u>both</u> Mr. Thomas' March 11, 2003 guest editorial column, as well as his columns before that, were critical of Ms. Wixon's service as City Clerk.

Since these cases are consolidated, the court requested during the May 2, 2005 conference that the motions filed in Case No. 04-2257 be refiled in the lead case, Case No. 04-2256.  In any event, the court's rulings, as announced on the record and memorialized in this memorandum and order, are applicable to all the above-referenced motions.

The plaintiffs, Messrs. How and Thomas, allege that the defendants, the City of Baxter Springs, the City Clerk (Ms. Wixon), and the City Attorney (Mr. Myers), are liable for substantial actual and punitive damages on account of violations of plaintiffs' First and Fourteenth Amendment rights, malicious prosecution, and abuse of process.  Specifically, Messrs. How and Thomas complain that, at defendants' request, the former were charged in Baxter Springs Municipal Court with having criminally defamed a city official (Ms. Wixon). As earlier indicated, these criminal charges arose out of the previously mentioned political advertisement published on March 11, 2003 in the *Baxter Springs News* by Mr. How, and the separate guest editorial column written by Mr. Thomas and published in the newspaper on the same date.  The criminal charges against Messrs. How and Thomas, however, were dismissed without prejudice in June 2003.

On April 27, 2005, Mr. How appeared for his deposition in this litigation.  During the deposition,  Mr. Keeley, as counsel for Ms. Wixon, asked Mr. How to identify the source of

an accusation contained in an April 9, 2002-letter to the editor authored by Mr. How.  On the rationale that the criminal defamation complaint against Mr. How which was signed by Ms. Wixon (and presumably drafted by Mr. Myers) only mentioned the March 11, 2003 political advertisement (instead of the April 8, 2002 letter to the editor or any other of Mr. How's letters to the editor), Mr. How refused to answer the question.  His deposition was eventually adjourned to allow the parties to properly raise the disputed issue with the court.

As earlier indicated, Mr. Thomas has not yet been deposed.  But counsel reasonably anticipate that he will be asked and then would object to the same sort of questions that earlier were asked of Mr. How.  That is, it is anticipated that Mr. Thomas would not reveal the sources of any of his columns other than the one published on March 11, 2003.

It is the court's understanding that Messrs. How and Thomas seek a protective order with regard to the identity of all of their "confidential" sources for information related to their letters to the editor, guest editorial columns, or other statements pertaining to defendants, except for the two written communications which specifically formed the pleaded basis of the municipal court criminal defamation charges.  These sources are asserted to be confidential in the sense that plaintiffs claim that they assured the third persons, including some still employed by the City of Baxter Springs who are thus under defendants' control, that their identities would not be disclosed.  Plaintiffs argue that they fear that defendants' only purpose in seeking the identity of these sources is to retaliate against them for having provided information to plaintiffs and to prevent them from doing so in the future.

Plaintiffs argue that the broad-ranging discovery sought by defendants is not relevant to the matters before the court or, even if it were deemed relevant, that it is protected by the "journalistic" privilege.  For the reasons stated on the record during the conference and as more fully set forth below, the court respectfully disagrees with plaintiffs on both points. Accordingly, the court will deny plaintiffs' motions for protective order and grant defendants' motions to compel.

As a practical matter, one should not lose sight of the fact that it was Messrs. How and Thomas who filed these lawsuits.  It strikes the court as unfair for plaintiffs now to seek to prevent the parties whom they have sued from obtaining information and evidence reasonably necessary to test the veracity of plaintiffs' claims.

Of course, Fed. R. Civ. P. 26(c) provides that the court, upon a showing of good cause, "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  But, as the parties seeking a protective order, plaintiffs must show that good cause exists to warrant such an order.[1]  "To establish good cause, [the] party must submit 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'"[2]  The court finds, at least given the record presented, that plaintiffs have not met their burden under

---

[1] *Bryan v. Eichenwald*, 191 F.R.D. 650, 651 (D. Kan. 2000) (citing *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D. Kan. 1996)).

[2] *Id.* (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16 (1981)).

Rule 26(c).

Plaintiffs' position in this dispute implicitly ignores that relevancy in federal court is broadly construed, and thus a request for discovery should be considered relevant if there is "any possibility" that the information sought may be relevant to the claim or defense of any party.[3]  A request for discovery should be allowed "unless it is clear that the information sought can have no possible bearing" on the claim or defense of a party.[4]  When the discovery sought appears relevant on its face (as is the case here), the parties resisting the discovery (plaintiffs) have the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm the discovery may cause would outweigh the presumption in favor of broad disclosure.[5]  Plaintiffs have done neither.

Plaintiffs' view of relevance here is myopic.  That is, plaintiffs would have the defendants and the trier of fact focus exclusively on the publications of March 11, 2003, essentially ignoring the context in which those materials were published and which in turn gave rise to the criminal defamation charges.

Based on a review of the parties' written submissions, it appears it is undisputed that,

---

[3] *Sheldon v. Vermonty*, 204 F.R.D. 679, 689-90 (D. Kan. 2001) (citations omitted).

[4] *Id.* (citations omitted).

[5] *Scott v. Leavenworth Unified Sch. Dist. No. 453*, 190 F.R.D. 583, 585 (D. Kan. 1999).

beginning in April 2002 or before, Messrs. How and Thomas had numerous letters to the editor and guest columns published in the *Baxter Springs News* concerning Ms. Wixon. Examples of the type of statements contained in Mr. How's letters to the editor are as follows:

> Mr. Chauffeur told Mrs. Travel Queen about this. So we had to have the chauffeur and two councilmen drag city employees to her office to get to the bottom of this dastardly deed. I understand she was all reared back in her chair like it really is her very own town. I understand that she was salivating.
>
> * * *
>
> P.S. Donna, I got none of this from any of your office people. Don't even begin one of your tirades on them.

Charles How, *Baxter Springs News*, April 9, 2002.

> Council, I have given you a way out. Get on it. Maybe she could get along at Lansing.
>
> People, phone your council. People, insist they get rid of this. We have ladies trying to work in the city hall. Can you imagine how they must feel. Lets turn it back into a reputable building.

Charles How, *Baxter Springs News*, June 7, 2002.

> Speaking of herself and Kirby. They were at city hall late tonight. I hope they were in a planning session to see how fast they could make the poor souls on Cherokee happy by paving the street. Amazing what we pay for and don't get!

Charles How, *Baxter Springs News*, July 5, 2002.

> Now lets view this, week before last, old Travel Queen and Mr. Misdirector spent an hour and a half sitting in his 4 wheel pickup at first and Wyandotte. She had her feet propped up on

the dash!  This was in daylight, close to Misdirector's house, but, she and her good buddy were supposedly checking a tall weed problem.  She said she was with Alan Bruel.  Don't believe Alan would have her in his pickup.  She likes to get the Chief of Police and Misdirector to drive her by property that complaints are made against.  Again, this is Alan Bruel's job to inspect these properties.  Her job is in the City Hall during work hours.

* * *

Reckon you can see why I write letters to the Editor?  Bet she won't get in the new dump truck, wish she would, we might be able to dump her off somewhere.

Charles How, *Baxter Springs News*, August 2, 2002.

I think we probably could, without a doubt, hire a city clerk with kindness, job appreciation, willingness to work with the mayor and high morals, for two thirds or less than we are paying the travel queen.

Charles How, *Baxter Springs News*, August 6, 2002.

Going back a month and a half, I wrote about a Council member who was jumping up and down in front of our houses.  I was thinking of this the other day and his defense of the Travel Queen when I told him I did not approve of the manner in which she was hired.  His reply was she was hired just like every one else.  Now, I bet if this person would go to the City Barn, and tell those hairy legged boys that his feet should be in rapid motion.

Charles How, *Baxter Springs News*, September 6, 2002.

Going back sometime this summer to the County fair.  Man, there was a lot of critters showing there even if a tad warm.  Well, let me tell you of the dangdest critter of all, it had on a pair of the skimpiest little ol' shorts you ever seen.  Went almost up to its waterline you would have thought Halloween had

arrived early.

Well about this time along comes Deputy Ken Horne of Our Sheriff's office, and danged if this critter didn't attack him. Well, the first thing you know, ol' Horne begins liking this attack. Don't know where this attack lead to, and don't really want to.

Just one more evening in the life of our travel queen. Ain't we just so lucky.

Charles How, *Baxter Springs News*, September 20, 2002.

Oh yes, the Travel Queen took a vacation day last week. Oh heck, you guessed it, oh Public Works Director had to take one too. Amazing.

Charles How, *Baxter Springs News*, September 24, 2002.

How in the world did we wind up with such crummy people on our City Council. Why do they keep this devisive [sic], blasted, hateful, over paid City Clerk. What a shame our town has become over all of her antics.

Charles How, *Baxter Springs News*, October 4, 2002.

Jo Stevens letter got me to thinking about all of the ladies that worked in City Hall. They all came in every day and did their job for our town. Never had men in the City Hall after hours, never took unnecessary trips, never stirred up hate and discontent, never rode around with city male employees, never sat in a pickup truck with their feet up on the dash for an hour and a half, never drove their vehicle to collect mileage from the City when the City could have provided a vehicle, and never, never, said anything disrespectful toward our mayors.

* * *

Wixon, the town is like the monkey living with the skunk. We have enjoyed all of you we can stand.

Charles How, *Baxter Springs News*, October 11, 2002.

> Now, get this people, last Monday the 28th, the workers at the city Barn were trying to find their boss, Bob Kirby, so they could get some questions answered.  No one at the Barn knew his whereabouts so they called the city office where Wixon hangs out.  Low and behold, he and Wixon had supposedly gone to Columbus.  Now citizens, these are department heads, with responsibilities to their underlings as well as the Mayor, this way [sic] the first time this has happened.   There have been complaints continually about this behavior by this pair.  Taking off to Wichita with no notice to the Mayor, we pay naturally.  Late night meetings at City Hall.  Both of these people have spouses at least Kirby does.

> \* \* \*

> I know any member of the council would not put up with their spouses conducting themselves in this manner.   You new members were especially elected because of these behaviors get some back bone.  Correct it put these people in their places and if they don't behave, I am sure at the ridiculous wages they are paid, that there are competent and hungry, qualified, wholesome, moral, people anxious for these jobs.  Enough stop it.  This is immoral, and directly in our faces arrogance.

Charles How, *Baxter Springs News*, November 8, 2002.

> Last week, the November 14 and 15 our travel queen took two days of her vacation.  Thursday, the 14th at 2:30 p.m. the public works director pulled into the city barn.  Here comes Wixon, and they go into his office and close the door.  At 2:30 p.m. Friday, here comes Kirby back to the barn, here comes Wixon to the barn, into his office, close the door and remain.  Who knows how long after all employees have gone home.

> People, for three years this woman has been nothing but disruptive to the operation of this city.   Arrogant and condescending toward John Murry.   Hateful to all city employees.  Why do we need this?  Some of the stories from citizens of this town who have had problems with this woman

are unbelievable.

Charles How, *Baxter Springs News*, November 26, 2002.

> This past weekend, ol faithful hateful travel queen was in the
> city hall at 6:30 a.m.  Why?  What is going on?  I have heard
> rumors it is because she can't get anything done during regular
> hours.  Maybe if she would run Kirby, Wene, and Deputy Dog,
> the one from the county fair out of her office she could get her
> work done.  I'll bet the rest of the ladies in the office would like
> to see an end to the distraction.

> I think after about the first letter that I wrote about ol T. C. and
> sweet Bobby, she got up and came to the front of the council,
> admonishing me and stating she had talked to a legal fellow.
> She also said I knew nothing about her.  Boy was she right at
> that point.  So I put my shoes on, started walking around asking
> questions.  Next thing you know, I'm in muck boots, then
> waders, and last of all chest waders, and folks it is still
> following, from Columbus to Joplin.

> \* \* \*

> As for the phone records, I have requested audits on any time
> she called sweet Bobby, in [sic] is considered an illegal closed
> meeting?  Hello Lansing.

Charles How, *Baxter Springs News*, December 27, 2002.

> Same article, Wixon wants new computers again.  Wants to buy
> them from Incode.  Really, just like that, no bids, just shell out
> another $130 or $140 thousand.  Does she get a kickback on
> this?

> \* \* \*

> Mr. Attorney would not stand for me asking questions, but he
> sure let a non-elected city clerk to have his ear all meeting.  I
> remember asking one of the city officials how the city clerk
> reacted when the new attorney was hired, just like an ole cat

curling around his leg.

Charles How, *Baxter Springs News*, January 31, 2003.

> Regarding the diatribe in the letter to the editor column of
> January 31 last.  This letter was written by county fair's deputy
> dog Ken Horn.  Plain and simple Ken Horn is employed as a
> deputy sheriff.  He is the person the City Clerk was all over at
> the county fair in Columbus.

Charles How, *Baxter Springs News*, February 7, 2003.

Simple fairness and common sense ultimately preclude the court from accepting plaintiffs' strained argument that the concept of relevance in these cases must be very narrowly defined by the scope of the communications which were the specifically stated bases of the criminal defamation prosecutions in municipal court.  That is, this court finds that the scope of discovery, as more broadly defined by defendants, and as evidenced by the continuing published writings of plaintiffs, directly relates to the defenses that have been pleaded by defendants in this case, i.e., that defendants initiated the criminal charges against plaintiffs without malice toward plaintiffs, and with probable cause to believe that plaintiffs had, repeatedly and continuously, defamed Ms. Wixon over the course of many months.  Of course, it will be for the trier of the fact to determine whether these defenses are meritorious.  But in any event, at this very early stage of the case, the court believes that defendants are entitled to discover the bases for the numerous statements by plaintiffs, in order to test and attempt to disprove their veracity.

The court further finds that the relevancy of the requested discovery clearly outweighs

the potential harm alleged by plaintiffs to their confidential sources.  All that plaintiffs have advanced is that they supposedly promised to undisclosed third persons not to disclose their identities, coupled with speculation about the grave consequences that would result from disclosure of the identities of the sources.  Nothing in this regard, however, has been substantiated.  Notably, plaintiffs could have, but elected not to, file under seal an affidavit from one or more of their confidential sources.  Indeed, not even plaintiffs have presented any credible evidence from which it could reasonably be inferred that retaliation against city personnel had occurred previously, or that it would occur in the future.

Privileged matters, of course, may be protected from discovery.[6]  In this regard, plaintiffs claim that the identification of their sources is protected by the First Amendment, akin to a "journalistic" privilege.  However, plaintiffs as the parties objecting to discovery on the grounds of privilege, have the burden to establish the privilege.[7]

Nothing in the record reasonably supports the hypothesis that Mr. How and Mr. Thomas are journalists.  Mr. How is self-employed.  He has no formal connection to the *Baxter Springs News*.  Mr. Thomas evidently is a retired patent attorney.  He is not an actual editor or reporter employed by the newspaper.

Therefore, any  claim of "journalistic" privilege is unsupportable, factually and legally.  Nevertheless, in an abundance of caution, the court will apply the balancing test

---

[6] Fed. R. Civ. P. 26(b)(1).

[7] *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550 (10th Cir. 1995).

O:\M & O\04-2256-JWL- 53,54,56.wpd                    -13-

suggested by the Tenth Circuit Court of Appeals in *Silkwood v Kerr-McGee Corp.*,[8] which recognized a "journalist privilege," and which plaintiffs claim is controlling, to the circumstances in these cases.  The *Silkwood* factors to be balanced are as follows: "(1) [w]hether the party seeking information has independently attempted to obtain the information elsewhere and has been unsuccessful; (2) [w]hether the information goes to the heart of the matter; (3) [w]hether the information is of certain relevance; and (4) [t]he type of controversy."[9]

As to the first factor, under the circumstances presented here, defendants obviously are unable to obtain the bases or sources of the statements of plaintiffs which Ms. Wixon claims are false from any origin other than plaintiffs.  Therefore, this factor weighs in favor of defendants.

The court will consider the second, third, and fourth factors together.  As previously stated, these cases basically allege malicious prosecution of plaintiffs by defendants.  In order to defend these cases, defendants must prove that they initiated the action against plaintiffs without malice, and with probable cause to believe that plaintiffs defamed Ms. Wixon.  As the court previously noted, the truth or veracity of plaintiffs' statements are relevant.  These remaining three factors, therefore, all weigh in favor of defendants.  Accordingly, even if *Silkwood* applies here, plaintiffs' purported privilege is not sustainable.

---

[8] 563 F.2d 433, 438 (10th Cir. Cir. 1997)(citing *Branzburg v. Hayes*, 408 U.S. 665 (1972)).

[9] *Id.* at 438 (citation omitted).

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.      Defendants' motions to compel (**docs. 53 & 56 in Case No. 04-2256, & doc.
45 in Case No. 04-2257**), are granted; plaintiffs' motions for protective order

(**doc. 54 in Case No. 04-2256, & doc. 44 in Case No. 04-2257**), are denied.

2.      Copies of this order shall be served on all counsel of record.

Dated this 5th day of May, 2005 at Kansas City, Kansas.




                                s/ James P. O'Hara
                                James P. O'Hara
                                U.S. Magistrate Judge